IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**ELVIN ROSS, SR., JERRY ROSS,
TOM ROSS, KEN ROSS,
CYNTHIA ROSS, and GREG ROSS,**

      **Plaintiffs,**

vs.                                         No. CIV 07-01037 RB/ACT

**THE BOARD OF REGENTS OF THE
UNIVERSITY OF NEW MEXICO,
THE UNIVERSITY OF NEW MEXICO and the
OFFICE OF THE MEDICAL INVESTIGATOR,
MERRILL HINES, M.D. and
REBECCA IRVINE, M.D.,**

      **Defendants.**

**MEMORANDUM OPINION AND ORDER**

      **THIS MATTER** came before the Court on Defendants' Motion for Summary Judgment, filed on April 24, 2008. Jurisdiction is founded upon 28 U.S.C. § 1331. Having considered the submissions of the parties, relevant law, and being otherwise fully advised, Defendants' Motion for Summary Judgment is **GRANTED**.

**I.  Background.**

      Plaintiff Elvin Ross, Sr. is the father of Elvin Ross, Jr. (herein after "the decedent"). Plaintiffs Jerry Ross, Tom Ross, Ken Ross, Cynthia Ross, and Greg Ross are the siblings of the decedent. They are San Carlos Apache of one-half sanguinity. Plaintiff Elvin Ross, Sr. is not a San Carlos Apache (Doc. 37).

      On or about July 6, 2005, the decedent, a Native American of one-half San Carlos Apache sanguinity, died from complications related to the chronic effects of head trauma and paralysis. Prior to his death, the decedent was a patient at Lovelace Medical Center, where he had been a

patient in the ICU for nearly a month when he died. The attending physician was not in a position to pronounce the manner of the decedent's death and deferred this medical/legal issue of proximate cause of death to the Office of the Medical Investigator at the University of New Mexico (hereinafter "OMI") (Doc. 1-2).

A representative of OMI contacted Cynthia Ross on July 7, 2005 and asked about the decedent's medical history (Doc. 24-2, 40-2). Ms. Ross related that the decedent had suffered head trauma on at least two occasions, including an adolescent accident and an altercation years later with a Joe Martinez, which caused life threatening injuries (Doc. 40-2). The representative of OMI told Ms. Ross that an examination would be done and the body would be released on July 9, 2005 (Doc. 40-2). Ms. Ross did not fully understand the extent of the proposed initial examination (Doc. 40-2).

On July 7, 2005, OMI conducted an autopsy of the decedent (Doc. 37). The autopsy was conducted at the direction of Wendy Honeyfield, acting in her capacity as a Deputy Medical Investigator. (Doc. 24-2). Dr. Merrill Hines performed the autopsy, and Dr. Rebecca Irvine was the supervising pathologist at the time of the autopsy (Doc. 37).

On July 8, 2005, Dr. Hines called Ms. Ross and related the preliminary findings of the autopsy, indicating that he believed the decedent's paralysis was the immediate cause of death and the cause of the paralysis would be the proximate cause of death, which would ultimately end up on the death certificate (Doc. 40-3). During the course of the conversation, Ms. Ross related an additional incident in which the decedent suffered head trauma at the hands of other individuals, possibly including law enforcement officials (Doc. 40-2, Doc. 40-3). Dr. Hines related to Ms. Ross the need to conduct additional tests, which included removal of portions of the decedent's brain and spinal cord (Doc. 40-2, 40-3). Ms. Ross stated that the family was in the process of making funeral arrangements (Doc. 40-2). Dr. Hines presented another option, which would allow the Ross family

to proceed with the funeral, stating that OMI could remove the brain and spinal cord from the body and cremate the organs (Doc. 40-2). Ms. Ross objected to cremation of the decedent's organs, based on the family's Native American religious beliefs (Doc. 40-2). Dr. Hines also recalled Ms. Ross speaking about a need to reunite the body with all of the organs, including the tissue that needed to be examined at a later time (Doc. 40-3). Ms. Ross told Dr. Hines that she would talk to family members and call him back after a couple of days (Doc. 40-2). Dr. Hines understood that she was not prepared to answer on behalf of the Ross family regarding questions on how the neurological tissue, spinal cord matter, and body should be handled (Doc. 40-3).

On July 9, 2005, OMI mistakenly released the remains of the decedent to the mortuary in Globe, Arizona (Doc. 37, 40-2). OMI retained portions of decedent's brain and spinal cord for additional tests (Doc. 40-2). Upon learning that the body had been released to the mortuary, Ms. Ross, overwhelmed with emotions, contacted Dr. Hines and explained that OMI had violated the decedent's body (Doc. 40-2). Dr. Hines explained that the mistake was caused by a clerical error, and he informed Ms. Ross that the decedent's brain tissue and spinal cord matter would be sent to the mortuary via Federal Express in after the autopsy was completed (Doc. 40-2). On July 20, 2005, OMI sent the brain tissue and spinal cord matter to the mortuary in Globe, Arizona by Federal Express (Doc. 40-2). The brain tissue and spinal cord matter were reinserted into the decedent's chest cavity, in anatomically incorrect locations (Doc. 40-2).

Plaintiffs brought this suit in a timely manner, alleging the autopsy interfered with Plaintiffs' and decedent's free exercise of religion, pursuant to the U.S. and New Mexico Constitutions; deprivation of property without just compensation, in violation of the Fifth Amendment of the U.S. Constitution and § 20 of the Constitution of the State of New Mexico; deprivation of substantive and procedural due process in violation of the Fourteenth Amendment of the U.S. Constitution;

conspiracy to deprive Plaintiffs of their civil rights; and violation of the New Mexico Tort Claims Act. Plaintiffs' federal claims rely on 42 U.S.C. §§ 1981, 1983, and 1988 for causes of action upon which relief can be granted. Plaintiffs' state claims rely on the Religious Freedom Restoration Act (hereinafter "RFRA") and Tort Claims Act for causes of action upon which relief can be granted.

## II. Summary Judgment Standard.

A motion for summary judgment may be granted only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact.'" *Munoz v. St. Mary Kirwan Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000). When applying this standard, the court examines the record and makes all reasonable inferences in the light most favorable to the non-moving party. *Id.*

The movant bears the initial burden of establishing that no genuine issue exists as to any material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 289 (1968)). The movant's initial burden may be discharged by showing there is an absence of evidence to support the non-moving party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the non-moving party on an essential element of that party's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). Once the movant meets its burden, the burden shifts to the non-moving party to demonstrate a

genuine issue for trial on a material matter.  *See McGarry v. Pitkin Co.*, 175 F.3d 1193, 1201 (10th Cir. 1999).

If the moving party satisfies its initial burden, the party opposing the motion for summary judgment may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing there is a genuine issue for trial as to a dispositive matter for which it carries the burden of proof.  *See Munoz,* 221 F.3d at 1164.  It is not sufficient "to simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co.*, 475 U.S. at 586.  An issue of material fact is genuine if a reasonable jury could return a verdict for the party opposing the motion.  *See Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1129 (10th Cir. 2003).  The substantive law at issue determines which facts are material in a given case.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *See Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986).

**III.   Discussion.**

  **A.   Federal Claims.**

Plaintiffs voluntarily withdrew their 42 U.S.C. § 1981 claims, conceding that governmental removal of human tissue does not fit within the analytical framework of 42 U.S.C. § 1981 (Doc. 22).  In addition, Plaintiffs did not properly plead facts that could plausibly give rise to an equal protection cause of action, pursuant to 42 U.S.C. § 1981.  *See Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1965-66 (2007).  All 42 U.S.C. § 1981 claims, therefore, must be dismissed.

42 U.S.C. § 1983 authorizes the assertion of a claim for relief against a "person" who acted under color of state law to cause a deprivation of a federally protected right.  The U.S. Supreme Court held in *Will v. Michigan Dept. of State Police* that a state, a state agency, or a state official sued in his or her official capacity for damages is not a suable "person" under 42 U.S.C. § 1983.

491 U.S. 58, 71 (1989). The Board of Regents of the University of New Mexico, The University of New Mexico, and the Office of the Medical Investigator, as agencies of the State of New Mexico, are not "persons" that can be sued under 42 U.S.C. § 1983. Drs. Hines and Irvine are sued in their official capacities only (Doc. 37). As a matter of law, all 42 U.S.C. § 1983 claims, therefore, must be dismissed.

Plaintiffs voluntarily withdrew their Fifth Amendment claim for deprivation of property without just compensation (Doc. 22). Because Plaintiffs' remaining constitutional claims–including a First Amendment free exercise of religion claim and a Fourteenth Amendment due process claim[1]–are reliant on 42 U.S.C. § 1983 for a cause of action, all constitutional claims must be dismissed for failure to state a claim upon which relief can be granted.

Because all 42 U.S.C. § 1981 and § 1983 claims have been dismissed, Plaintiffs are barred from seeking relief under 42 U.S.C. § 1988.

**B.     State Claims.**

Plaintiffs Jerry Ross, Tom Ross, Ken Ross, Cynthia Ross, and Gregg Ross, who are siblings of the decedent, lack standing to assert a claim in this lawsuit. The Supreme Court of New Mexico has unequivocally held that, in the absence of a surviving spouse or child of the decedent, a surviving parent is the only proper remaining party with standing to assert a claim in a lawsuit. *Smialek v. Begay*, 104 N.M. 375, 721 P.2d 1306 (1986). The New Mexico Legislature did not overrule this holding by the RFRA. *See* N.M. Stat. § 28-22-2 (2000). Under the cases cited by Plaintiffs–*Flores v. Baca*, 117 N.M. 308, 871 P.2d 962 (1994) and *Jaynes v. Strong-Thorne*

---

[1] Plaintiffs referenced a Fourth Amendment claim for the first time in their Response to Defendants' Motion for Summary Judgment (Doc. 22). This claim was not properly pled, pursuant to the notice pleading requirement of Fed.R.Civ.P. 8(a)(2), and is barred. *See Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1964-65 (2007).

*Mortuary, Inc.*, 124 N.M. 613, 954 P.2d 45 (1997)–family members had standing to sue a mortuary as third-party beneficiaries of funeral and burial contract. There is no showing in the record that Plaintiffs contracted for an autopsy in this case. Indeed, Plaintiffs deny that they consented to an autopsy (Doc. 1-2). There is not a contractual dispute in this case. Ken Ross, Cynthia Ross, and Gregg Ross, therefore, must be dropped as parties to this lawsuit.

Because it is unclear whether Plaintiffs voluntarily withdrew their claim regarding the deprivation of property without compensation in violation of § 20 of the Constitution of the State of New Mexico, the Court addresses the issue and finds that Plaintiffs failed to state a claim upon which relief can be granted. The Supreme Court of New Mexico has held that there is a quasi-property right in a dead body which vests in the nearest relative of the deceased. *Barela v. Frank A. Hubbell Company*, 67 N.M. 319, 355 P.2d 133 (1960). This quasi-property right may, under some circumstances, create a due process right to notice of an intended autopsy or disinterment,[2] but it absolutely does not create a right for compensation under § 20 of the Constitution of the State of New Mexico in the event that tissue is retained as part of an autopsy performed by or on behalf of the State. *See In re Johnson*, 94 N.M. 491, 494, 612 P.2d 1302, 1305 (noting only the potential of a due process claim for a state mandated autopsy). Plaintiffs' claims under § 20 of the Constitution of the State of New Mexico, therefore, must be dismissed.

The doctrine of sovereign immunity and the Eleventh Amendment bars suits against the State of New Mexico and its agencies, unless the State has waived its immunity. *See Alden v. Maine*, 527 U.S. 706, 712-13 (1999). *See also Will*, 491 U.S. at 66. Plaintiffs' claims under the Tort Claims Act are based on specific waivers of immunity, pursuant to N.M. Stat. §§ 41-4-9 and 41-4-10

---

[2] Plaintiffs pled due process claims under the U.S. Constitution, but failed to plead due process claims under the Constitution of the State of New Mexico.

(1978). These grants of immunity, however, are inapplicable to this case. "The general rules of statutory construction require that words of a statute should be given their ordinary, everyday meaning." *State ex rel. Reynolds v. Aamodt*, 111 N.M. 4, 5 800 P.2d 1061, 1062 (1990). OMI is essentially a coroner's office. It conducts death investigations, often on behalf of law enforcement officials.[3] OMI is not a "hospital, infirmary, mental institution, clinic, dispensary, medical care home or like facility." N.M. Stat. § 41-4-9 (1978). The distinctive feature of these institutions and "like" facilities is their collective mission to promote health and healing among the living. OMI does not provide "health care services." N.M. Stat. § 41-4-10 (1978). Indeed, "health care services," by definition, can only be rendered to the living. *See Redding v. City of Truth or Consequences*, 102 N.M. 226, 228, 693 P.2d 594, 596 (N.M.App. 1984)(noting that N.M. Stat. § 41-4-9 applies to the operation of facilities which provide medical care directly to people). Plaintiffs' claims under the Tort Claims Act, therefore, are barred by sovereign immunity.

The Court finds that the autopsy, including the removal of portions of decedent's brain and spinal cord matter, was a medico-legal autopsy authorized under N.M. Stat. § 24-12-4(D). "An autopsy or post-mortem examination may be performed by a pathologist at the direction of the state, district, or deputy medical investigator when he suspects the death was caused by a criminal act or omission or if the cause of death is obscure." N.M. Stat. § 24-12-4(D) (1978). "Autopsy" is defined as "a post-mortem dissection of a dead human body in order to determine the cause, seat or nature of disease or injury and includes the retention of tissues customarily removed during the course of

---

[3]Under N.M. Stat. § 41-4-12 (1978), the State has waived its immunity for torts, including "violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico," when caused by law enforcement officers; however, Plaintiffs failed to plead waiver of sovereign immunity under N.M. Stat. § 41-4-12.

autopsy for evidentiary, identification, diagnosis, scientific or therapeutic purposes." N.M. Stat. § 24-12-4(E) (1978). Clinical autopsies are voluntary, performed for a fee, and done at the request of an entity or a family member (Doc. 24-3). The record indicates that the autopsy was performed at the direction of Ms. Honeyfield, acting in her capacity as a deputy medical investigator for the OMI, because the cause of decedent's death was obscure and there was suspicion that his death was caused by a criminal act (Doc. 24-2, 24-3, 29-3, 29-4). The record does not indicate that Plaintiffs paid a fee for the autopsy, and Plaintiffs specifically contend that they did not consent to the autopsy (Doc. 37). Plaintiffs' contention that the nature of the autopsy is a contested material fact, therefore, is without merit. Indeed, the record taken as a whole could not lead a rational trier of fact to find that the autopsy was clinical in nature. *See Matsushita Elec. Indus. Co.,* 475 U.S. at 587.

The Court finds that Plaintiffs have adequately pled a cause of action under the RFRA. N.M. Stat. § 28-22-3 (2000). "Pleadings must be construed so as to do justice." Fed.R.Civ.P. 8(e). The notice pleading requirement of Fed.R.Civ.P. 8(a)(2) allows for great generality, so long as the defendant is given fair notice of what is being asserted against him. *See Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1964-65 (2007). Plaintiffs' averment that "[t]he autopsy and removal of a large majority [of] decedent's brain and spinal chord interfered with Plaintiffs' and decedent's free exercise of their religion pursuant to the United States and New Mexico Constitutions" is sufficiently plain to give Defendants fair notice of a claim under the RFRA. The State of New Mexico has waived its immunity for claims under the RFRA and authorized relief under the Tort Claims Act, allowing Plaintiffs' RFRA claim to survive Defendants' assertion of sovereign immunity. N.M. Stat. § 28-22-4 (2000).

Plaintiff Elvin Ross, Sr., the father of the decedent, is the only individual with standing to assert a claim under the RFRA. Plaintiff Elvin Ross, Sr. must assert that the free exercise of *his*

9

religious beliefs has been restricted to state a claim under the RFRA. Plaintiff Elvin Ross, Sr. lacks standing to assert a violation of the decedent's religious beliefs. *See Smialek*, 104 N.M. at 377, 721 P.2d at 1308 (stating "[w]e hold, therefore, that since, in the absence of a surviving spouse or child of the decedent, the mother was the only proper remaining survivor to claim and bury her son's body, she was the only proper remaining survivor with standing to assert an alleged violation of the free exercise of *her* religious beliefs).[4] Elvin Ross, Sr. is not a San Carlos Apache (Doc. 37), and the record is devoid of any information regarding his personal religious beliefs. Plaintiffs, therefore, have failed to state a claim, under the RFRA, upon which relief can be granted.[5]

The Court does not wish to denigrate the legitimate concerns of members of the Ross family that their religious traditions be taken into account. A history of recognition of and respect for Native American burial traditions sadly does not exist in the United States. Instead, the development of our nation's laws regarding the handling and burial of the dead have reflected the Anglican customs and practices imported from England, the source of our common law, and not

---

[4]Even if Plaintiff Elvin Ross, Sr. could bring a claim on behalf of the decedent, the Court lacks a means of accurately assessing decedent's religious beliefs. One-half San Carlos Apache sanguinity does not create a presumption of belief in San Carlos Apache religious traditions. Indeed, religious beliefs do not flow in the veins.

[5]The New Mexico courts have not yet interpreted N.M. Stat. § 28-22-3 of the RFRA, which states: "A government agency shall not restrict a person's free exercise of religion unless: the restriction is in the form of a rule of general applicability and does not directly discriminate against religion or among religions; *and* the application of the restriction to the person is essential to further a compelling governmental interest *and* is the least restrictive means of furthering that compelling governmental interest." (Emphasis added). But the statutory authorization, in N.M. Stat. § 24-12-4(D), to perform an autopsy without consent at "the direction of the state, district, or deputy medical investigator when he suspects the death was caused by a criminal act or omission or if the cause of death is obscure," pursuant to N.M. Stat. § 24-12-4(D), probably does not survive the strict scrutiny requirements of N.M. Stat. § 28-22-3. The statute's lack of commonsense due process considerations, including a requirement that the next of kin receive adequate notice and the right to have their views taken into consideration in determining the necessity of an autopsy, is particularly problematic.

those of other cultures.  *See generally* Jack F. Trope & Walter R. Echo-Hawk, The Native American Graves Protection and Repatriation Act: Background and Legislative History, 24 Ariz.St.L.J. 35, 45 (1992).  These laws are often drafted to provide little or no flexibility to accommodate the diverse traditions of persons adhering to Native American, Orthodox Jew, Hmong, or other religions.  The state legislature, noting New Mexico's culturally diverse population, might consider amending its laws to take into consideration Native American's traditional religious objections to autopsies.[6]

**IV.    Conclusion.**

**WHEREFORE,**

**IT IS ORDERED** that Defendants' Motion for Summary Judgment, filed on April 24, 2008, is **GRANTED**.

**A JUDGMENT CONSISTENT WITH THIS MEMORANDUM OPINION AND ORDER SHALL ISSUE FORTHWITH.**

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**

---

[6] Other states have successfully instituted statutes which require consideration of the next of kin's religious views in determining the necessity of an autopsy. *See, e.g.* Cal. Gov't Code § 27491.43 (West 1988); N.Y.Pub. Health Law § 4210-c (McKinney 1985).  These statutes include exceptions, allowing the state to conduct an autopsy without consent upon a showing of reasonable suspicion that the death was caused by a criminal act or by a contagious disease constituting a public health hazard.